# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARIEL ULBERG, KERRI HARACZ, and LACHAE VICKERS, individually and on behalf of all others similarly situated, | 2:24-cv-03302-NJC-ARL |
| Plaintiffs, | |
| - against - | First Amended Class Action Complaint |
| WALMART INC., | Jury Trial Demanded |
| Defendant | |

Ariel Ulberg ("Plaintiff Ulberg"), Kerri Haracz ("Plaintiff Haracz"), and Lachae Vickers ("Plaintiff Vickers") ("Plaintiffs") through Counsel, allege upon information and belief, except for allegations about Plaintiffs, which are based on personal knowledge:

1.    A coral consists of small, plankton-eating invertebrates called polyps.

 

2.    Though mistaken for inanimate rocks or plants, corals are animals.

3.     Unlike plants which make their own food, corals use tiny tentacle-like arms to capture food and consume it through their mouths.

4.     The soft-bodied polyps have an outer limestone, or calcium carbonate skeleton, for protection.

5.     What most people understand as "coral reefs" begin as free-swimming coral larvae that have attached to underwater rocks or hard surfaces.

6.     Like all living things which thrive in specific geographic areas, traditional coral reefs flourish in shallow waters.

7.     This is because the algae that sustains them requires sunlight that is best absorbed when close to the ocean surface.

8.     Since the algae necessary for coral to thrive requires stable, warm temperatures, corals are generally found in tropical regions.

9.     Coral reefs expand only centimeters per year, taking thousands of years to develop.

10.     Coral is a building block of ecosystems which, though occupying less than 0.1% of oceans, provide homes for a quarter of all marine life.

11.     The excess sugar produced by algae is transformed into a slimy mucus-like substance, which is consumed by bacteria and other smaller microbes.

12.     This attracts larger sea creatures like crabs, shrimp, snails, and worms which are also seeking food.

13.   Finally, fish and other larger marine species like turtles show up, creating

an endless loop where nutrients are recycled, and the ecosystem thrives.



14.   While the coral benefits from the abundance of marine activity, it also

provides shelter for fish where they can reproduce and hide from predators.

 

15.    While most people associate coral reefs with bright colors and tropical climates, close to the ocean surface, these ecosystems are found deep in cooler waters, in temperate regions.



16.    This includes off the coast of New York.

17.    Instead of subsisting on algae, these adaptive lifeforms obtain energy

through organisms passing through the deepest parts of the sea.

18.    These reefs contain not only coral, but seaweed, bivalve mollusks, plants, and worms.

19.    The waters off New York are home to coral reefs, such as the *Astrangea poculata*, "a temperate encrusting stony coral."[1]



20.    Whether in tropical or temperate regions, coral reefs are natural resources that protect the nearby land coast while providing a habitat for marine life.

21.    Unfortunately, coral reefs have been placed in peril by a variety of manmade threats and have declined by roughly half since 1950.

22.    The result is that previously teeming ecosystems have disappeared, as

---

[1] https://reefs.com/coral-diversity-in-new-york/

luminescent and vibrant coral reefs become barren, due to external causes such as excess nutrients like nitrogen and phosphorus, global warming, overfishing and absorption of chemicals.



23.    Within the past several years, researchers determined that chemicals in sunscreen are a significant factor in their decline.

24.    This was confirmed by studies in journals, such as Archives of Environmental Contamination and Toxicology, which concluded common ultraviolet filters in sunscreen, oxybenzone and octinoxate, were causing immense harm to coral reefs.

25.    Laboratory tests established that when baby coral were exposed to oxybenzone, octinoxate and/or parabens, they experienced "coral bleaching," shown by the white polyps below.



26.    The loss of their symbiotic algae causes coral to turn white, rendering them more susceptible to disease and death.

27.    Moreover, bleached corals means the habitat of fish and other marine life is degraded, rendering their survival and reproduction more difficult.

28.    The damage caused by chemicals in sunscreens washing off swimmers and harming coral reefs has been documented by the non-profit Haereticus Environmental Laboratory ("HEL"), the National Park Service ("NPS") and scientists across the globe.

29.    These groups recommend that beachgoers use sunscreen formulated to be safe for coral reefs and ocean life.

30.    This typically means avoiding chemical sunscreens which rely on synthetic compounds to absorb ultraviolet ("UV") rays from the sun.

31.    Groups like Coral Guardian have been at the forefront of informing the

public of the harm endured by coral reefs, and promoting activities which limit or prevent such harm.

32.    The Columbia Climate School cited a Gallup survey showing that roughly three-quarters of Americans are concerned for the environment, with many believing it is getting worse, due in large part to human activities.

33.    The National Oceanic and Atmospheric Administration ("NOAA") has recognized that consumers are alarmed at possible harm to coral reef ecosystems, creating a webpage, entitled, "What can I do to protect coral reefs?," because "Even if you live far from coral reefs, you can have an impact on reef health and conservation."[2]

34.    Seeking to capitalize on growing consumer awareness of the harm caused to these "rainforests of the sea," Walmart Inc. ("Defendant") manufactures and/or markets sunscreen labeled as "Reef Friendly," understood consistent with common usage and dictionary definitions as "not causing or likely to cause harm," above a picture of a reef, under its Equate brand ("Product").[3]

---

[2] https://oceanservice.noaa.gov/facts/thingsyoucando.html
[3] The representations and/or marketing are substantially similar across other SPF varieties offered.




35.   An asterisk next to "Reef Friendly" corresponds to a smaller statement in the lower corner, which states, "Octinoxate, Oxybenzone & Paraben Free.[*]"

36.   While early studies identified octinoxate, oxybenzone, and/or parabens as posing existential harm to coral reefs, recent research indicates other ingredients pose an equivalent, or even greater threat.

37.   This is confirmed by the Reef Safe Sunscreen Buying Guide from a leading snorkeling website, Snorkel Around The World.

38.   It emphasized that "Dangerous ingredients" to coral reefs also include avobenzone, octoclyrene, octisalate, and homosalate.[4]

---

[4] Best Reef Safe Sunscreen.

9



39.   That the absence of octinoxate, oxybenzone, and parabens, is not sufficient to describe sunscreen as "reef friendly" is recognized in Hawaii, where the harm to reefs from chemical sunscreens was discovered.

40.   One beachfront placard there implores swimmers to "SAVE OUR REEFS," cautioning beachgoers to "Avoid Using [Sunscreens]" that not only contain "OXIBENZONE [and] OCTINOXATE," but also "AVOBENZONE, HOMOSALATE, OCTOCRYLENE, OCTISALATE [AND OTHER] TOXIC INGREDIENTS."



41. That "avobenzone, homosalate, octocrylene, [and] octisalate" have been linked to coral bleaching and harm to reefs has been confirmed by independent studies.

42. For example, newer studies have shown that the common sunscreen ingredient of octocrylene may generate benzophenone, a carcinogenic chemical that is "bad for fish, corals, and other invertebrates."

43. Though consumers buying Defendant's sunscreen expect it to be "reef friendly" and not harmful to reefs, its active ingredients are the "unfriendly" chemicals of "Avobenzone (3.0%), Homosalate (10.0%), Octisalate (5.0%), [and] Octocrylene (4.0%)," only disclosed on the back of the container, in fine print.





44.   Moreover, it contains nine "inactive" ingredients, further down the label,

many of which have been linked to causing harm to reef ecosystems.



*Inactive ingredients*

Alcohol Denat., Butyloctyl Salicylate, Acrylates/Octylacrylamide Copolymer, Panthenol, Tocopherol, Fragrance, Stearoxytrimethylsilane, Caprylic/Capric Triglyceride, Glycerin

45.    Should purchasers turn around the container to look at these ingredients, they are not provided what Snorkel Around The World and Hawaii already know about these decidedly "reef [un]friendly" ingredients.

46.    Nor are consumers told what renowned dermatologist Dr. Henry W. Lim of the Henry Ford Medical Center in Detroit, knows, about how "[t]he definition of what the manufacturer might mean by 'reef safe' and similar terms keeps broadening."

47.    Another expert described terms, including "reef friendly," as "really just a sales gimmick at the moment."

48.    To protect the public against such "sales gimmicks," the Pure Food and Drug Act of 1906 established a baseline of truthfulness for products sold at the local drug store.

49.    These requirements were strengthened by the Federal Food, Drug, and Cosmetic Act ("FFDCA"), which applied to over-the-counter ("OTC") drugs like sunscreen. 21 U.S.C. § 301 *et seq*.; 21 C.F.R. Parts 200 and 300.

50.    As the scale of deception in consumer products increased beyond descriptions of efficacy to environmental attributes, the Federal Trade Commission ("FTC") sought to rein in such environmental marketing claims through its "Green Guides." 16 C.F.R. Part 260 ("Guides for the Use of Environmental Marketing Claims").

51.  New York adopted these requirements so its citizens could make informed decisions about what they were buying through its Education Law ("EDN"), Environmental Conservation Law ("ECL"), and administrative guidance, through but not including its Procurement Guidelines. *See* EDN, Title 8, Article 137 – Pharmacy, § 6800 *et seq.*; EDN § 6802(13) (requiring compliance with identical federal statutes and regulations); Title 8, New York Codes, Rules, and Regulations ("NYCRR") § 29.7(a)(16) ("Special provisions for the professions of pharmacy and registered pharmacy technicians"); ECL § 1-0101(2)-(3) (describing "the policy of the state…in cooperation with the federal government," to include "Guaranteeing that the widest range of beneficial uses of the environment is attained without risk to health or safety, unnecessary degradation or other undesirable or unintended consequences").

52.  The FDA, FTC, and this State's legislative and administrative bodies, knew that "consumers initially [] rely on extrinsic cues such as visual information on labels and packaging," and these rules were designed to create an honest marketplace.[5]

---

[5] Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Products Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations," Food Quality and Preference, 94 (2021): 104326; Okamoto and Ippeita, "Extrinsic Information Influences Taste and Flavor Perception: A Review

53.    The description of the Product as "Reef Friendly" is "false or misleading," because its active and inactive ingredients, including avobenzone, homosalate, octisalate, and octocrylene, are harmful to coral reefs, causing it to be "misbranded."[6] EDN § 6815(2)(a); 21 U.S.C. § 352(a)(1) (defining "misbranded" where an OTC product's "labeling is false or misleading in any particular.").

54.    The Product's description as "reef friendly" "overstat[es], directly or by implication, [its] environmental attribute[s] or benefit[s]," related to its impact on fragile and critical reef ecosystems, such that its use will not cause harm to reefs, even though its active and inactive ingredients, including avobenzone, homosalate, octisalate, and octocrylene, are harmful to reefs. 16 C.F.R. § 260.3(c).

55.    The Product's "unqualified" description as "reef friendly" "convey[s] that [it] has specific and far-reaching environmental benefits…[and] no negative environmental impact" on fragile and critical reef ecosystems, even though its active and inactive ingredients, including avobenzone, homosalate, octisalate, and octocrylene, are harmful to reefs. 16 C.F.R. § 260.4(b).

56.    Nowhere on the labeling does the Product tell purchasers that its active and inactive ingredients, including avobenzone, homosalate, octisalate, and octocrylene, are harmful to reefs and not "reef friendly."

---

from Psychological and Neuroimaging Perspectives," Seminars in Cell & Developmental Biology, 24.3, Academic Press, 2013.

[6] "Misbranded" is a statutory term of the era, used to denote the capacity to mislead.

57.   As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than $4.99 for 5.5 oz (156 g), excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION

58.   Plaintiff Ulberg is a citizen of New York.

59.   Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

60.   The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

61.   The Court has jurisdiction over Defendant because it transacts business within New York and sells the Product to consumers within New York from its almost 100 stores in this State and/or online, to citizens of this State.

62.   Defendant transacts business in New York, through the sale of the Product to citizens of New York from its almost 100 stores in this State and/or online, to citizens of this State.

63.   Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

64.   Defendant has committed tortious acts outside this State by labeling,

representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, quantity, attributes, type, origins, amount, and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

65.    Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, quantity, attributes, type, origins, amount, and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

## VENUE

66.    Plaintiff Argenzio resided in Suffolk County.

67.    Plaintiff Ulberg resides in Suffolk County.

68.    Venue is in this Court because a substantial or entire part of the events or omissions giving rise to Plaintiff Argenzio and Plaintiff Ulberg's claims occurred in Suffolk County.

## PARTIES

69.    Plaintiff Ariel Ulberg is a citizen of Suffolk County, New York.

70. Plaintiff Kerri Haracz is a citizen of Putnam County, New York.

71. Plaintiff Lachae Vickers is a citizen of Suffolk County, New York.

72. Defendant Walmart Inc. is a citizen of Delaware and Arkansas.

73. Walmart is an American multinational retail corporation that operates a chain of over 4,600 superstores throughout the nation, with almost 100 in New York, selling everything from furniture to electronics to groceries.

74. While Walmart sells leading national brands, it also sells many products under one of its private label brands, Equate.

75. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

76. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

77. Products under the Equate brand have an industry-wide reputation for quality.

78. In releasing products under the Equate brand, Walmart's foremost criteria was to have high-quality products that were equal to or better than the national brands, and oftentimes cost less than national brands.

79. Walmart gets national brands to produce its private label items due its loyal customer base and high standards.

80.   Private label products under the Equate brand benefit by their association with consumers' appreciation for the Walmart brand overall.

81.   That Equate products met this high bar was or would be proven by focus groups, rating them above their name brand equivalent.

82.   A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands [like Equate] are good alternatives to national brands, and more than 60 percent consider them to be just as good."

83.   Private label products generate higher profits for retailers like Walmart, because national brands spend significantly more on marketing, contributing to their higher prices.

84.   The result is that private label products can be sold at relatively lower costs compared to national brands.

85.   The development of private label items is a growth area for Walmart, as they select only top suppliers to develop and produce Equate products.

86.   Plaintiffs, like many consumers, seek to purchase products which have a reduced environmental impact, and which cause minimal environmental harm, relative to themselves and other products.

87.   This includes impact on coral reefs and ocean ecosystems.

88.   Plaintiffs and consumers understood "Reef Friendly," above a picture of a reef, consistent with common usage and dictionary definitions as "not causing or

likely to cause harm," to mean (1) the sunscreen would not cause harm to reefs when worn in open waters, (2) its use was generally better for the environment than products not so advertised, and/or (3) its use did not cause environmental harm.

89.   Plaintiffs read and relied on the front label, which described it as "Reef Friendly," above a picture of a reef.

90.   Plaintiffs relied on the omissions which failed to tell them that its use would not be "friendly" to reefs, but harmful to them.

91.   Plaintiffs were not aware that the Product's active and inactive ingredients did not protect and safeguard reefs but were harmful to coral reefs.

92.    Plaintiffs sought to purchase sunscreen that would not cause harm to reefs and/or was not or was less detrimental to the environment.

93.   Plaintiffs purchased the Product between March 2021 and August 2024, at Walmart locations in the counties they reside and/or other counties in New York.

94.   Plaintiffs bought the Product at or exceeding the above-referenced price.

95.   Plaintiffs paid more for the Product than they would have had they known it was not "Reef Friendly," and/or was detrimental to the environment, as they would not have bought it, or would have paid less.

96.   Plaintiffs were caused to pay more for the Product than they would have due to the marketing and representations identified here.

97.   The Product was worth less than what Plaintiffs paid, and they would not

have paid as much absent Defendant's false and misleading statements and omissions.

98.   Plaintiffs chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components, in the context of choice-based selection.

## CLASS ALLEGATIONS

99.   Plaintiffs seeks to represent the following class:

> All persons in New York who purchased the Product in New York during the statutes of limitations for each cause of action alleged.

100.  Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediate family members of any of the foregoing persons, (b) governmental entities, (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself or herself from the Class.

101.  Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiffs and class members are entitled to damages.

102.  Plaintiffs' claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

103. Plaintiffs are adequate representatives because their interests do not conflict with other members.

104. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

105. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

106. The class is sufficiently numerous, with over 100 members, because the Product has been sold throughout the State for several years with the representations, omissions, packaging, and labeling identified here, at almost 100 Walmart stores in New York and online, to citizens of this State.

107. Plaintiffs' Counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
General Business Law ("GBL") §§ 349 and 350

108. Plaintiffs incorporate by reference any above paragraphs deemed necessary notwithstanding "incorporation by reference" is an outdated practice and appropriately described as a vestigial evolutionary feature of our litigation procedures.[7]

---

[7] Antonio Gidi, "Incorporation By Reference: Requiem For A Useless Tradition." Hastings Law Journal 70: 989.

109. The purpose of the GBL is to protect consumers against unfair and deceptive practices.

110. This includes making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

111. The GBL considers false advertising, unfair acts, and deceptive practices in the conduct of any trade or commerce to be unlawful.

112. Violations of the GBL can be based on other laws and standards related to consumer deception.

113. Violations of the GBL can be based on the principles of the Federal Trade Commission Act ("FTC Act") and FTC decisions with respect to those principles. 15 U.S.C. § 45 *et seq*.

114. A GBL violation can occur whenever any rules promulgated pursuant to the FTC Act, 15 U.S.C. § 41 *et seq*., are violated.

115. A GBL violation can occur whenever the standards of unfairness and deception set forth and interpreted by the FTC or the federal courts relating to the FTC Act are violated.

116. A GBL violation can occur whenever any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices is violated.

117. In considering whether advertising is misleading in a material respect,

the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations." 15 U.S.C. § 55(a)(1).

118. In considering whether the label and/or packaging of OTC products is misleading, it is required to consider not only representations made or suggested by statements, images, and/or design, but also the extent to which this fails to prominently and conspicuously reveal facts relative to (1) the proportions or absence of certain ingredients, and/or (2) other facts concerning its attributes and characteristics, such as ingredients, quantity, origin, type, and/or quality, which are of material interest to consumers. EDN § 6802(13).

119. Defendant's false and deceptive representations and omissions with respect to the Product's contents, attributes, features, ingredients, and/or quality, that it would not cause environmental harm, and/or that its use would promote the safeguarding of the fragile and critical ecosystems of reefs, are material in that they are likely to influence consumer purchasing decisions.

120. This is because consumers prefer to buy products made of ingredients which do not cause detrimental effects on ecosystems like reefs, instead of having those ingredients replaced with others that cause such detrimental effects.

121. The replacement of ingredients which do not cause detrimental effects to ecosystems like reefs with ingredients which are responsible for such effects, is of

material interest to consumers, because (1) they prefer OTC products which not only protect them, but whose usage is protective or "friendly," and certainly not harmful, of ecosystems like reefs, (2) the former ingredients cost more than the latter, (3) they seek to avoid more harmful ingredients, whether in the context of applying such products to their bodies or to the ecosystems impacted by their application of such products to their bodies, and/or (4) they seek products which tout their environmental bona fides, for reasons related to health, environmental harm, and/or quality.

122. The Product could have included ingredients which were not harmful to critical and fragile ecosystems like reefs, but added ingredients which are known to have detrimental effects on them, because they cost less and/or substituted for ingredients which would not have detrimental effects on reefs.

123. The labeling of the Product violated the FTC Act and thereby violated the GBL because the representations, omissions, packaging, and labeling, "Reef Friendly," above a picture of a reef, created the erroneous impression it consisted of ingredients that would not be detrimental to critical and fragile ecosystems like reefs, when this was false, because it contained ingredients which are known to have detrimental effects on them.

124. The labeling of the Product violates laws, statutes, rules and regulations which proscribe unfair, deceptive, immoral, and/or unconscionable acts or practices,

intended to protect the public, thereby violating the GBL.

125. Violations of the GBL can be based on public policy, established by norms, customs, statutes, law, or regulations.

126. The labeling of the Product violated the GBL because the representations, omissions, labeling, and packaging, "Reef Friendly," above a picture of a reef, was unfair and deceptive to consumers.

127. The labeling of the Product violated the GBL because the representations, omissions, packaging, and labeling, "Reef Friendly," above a picture of a reef, was contrary to the GBL, EDN, and/or ECL, which adopted, where applicable, other laws and regulations.

| Federal | State |
|---|---|
| 21 U.S.C. § 352(a)(1) | EDN § 6815(2)(a) |
| | ECL § 1-0101(2)-(3) |
| | 8 N.Y.C.R.R. § 29.7(a)(16) |
| 16 C.F.R. § 260.3(c) | |
| 16 C.F.R. § 260.4(b) | |

128. Plaintiffs believed the Product contained ingredients, such that use of the sunscreen would not cause harm to critical and fragile reef ecosystems.

129. Plaintiffs paid more for the Product and would not have paid as much if they knew that it was not "reef friendly," but contained ingredients known to have detrimental effects on reefs.

130. Plaintiffs will produce evidence showing how they and consumers paid more than they would have paid for the Product, relying on Defendant's representations, omissions, packaging, and labeling, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis, and other advanced methodologies.

131. This means the individual damages will be based on the value attributed to the challenged claims and/or omissions, a percentage of the total price paid.

132. Plaintiffs seek to recover for economic injury and/or loss they sustained based on the misleading labeling and packaging of the Product, a deceptive practice under the GBL.

133. As a result of Defendant's misrepresentations and omissions, Plaintiffs were injured and suffered damages by payment of a price premium for the Product, which is the difference between what they paid based on its labeling, packaging, representations, statements, omissions, and/or marketing, and how much it would have been sold for without the misleading labeling, packaging, representations, statements, omissions, and/or marketing identified here.

<u>Jury Demand and Prayer for Relief</u>

Plaintiffs demand a jury trial on all issues.

**WHEREFORE**, Plaintiffs pray for judgment:

1. Declaring this a proper class action, certifying Plaintiffs as representatives and

the undersigned as Counsel for the class;

2. Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiffs'
   attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   September 29, 2024

Respectfully submitted,

/s/  Spencer Sheehan
Sheehan & Associates P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

Notice of Lead Counsel Designation:

Spencer Sheehan

Sheehan & Associates P.C.

Counsel for Plaintiffs

## Certificate of Service

I certify that on September 29, 2024, I served and/or transmitted the foregoing by the method below to the persons or entities indicated, at their last known address of record (blank where not applicable).

|  | Electronic Filing | First-Class Mail | Email | Fax |
|---|---|---|---|---|
| Defendant's Counsel | ☒ | ☐ | ☐ | ☐ |
| Plaintiffs' Counsel | ☒ | ☐ | ☐ | ☐ |
| Court | ☒ | ☐ | ☐ | ☐ |

/s/ Spencer Sheehan